**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Case No. 25-<u>10977</u> |
| IMMERSIVE ART SPACE LP, | Chapter 11 |
| Debtor. | Subchapter V |

**DECLARATION OF MICHAEL WILLETTS, CONSULTANT AND AUTHORIZED AGENT, IN SUPPORT OF CHAPTER 11 PETITION AND SUBCHAPTER V CASE**

I, Michael Willetts, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.  My name is Michael Willetts. I am over the age of 21. I am a Consultant and Authorized Agent of Immersive Art Space LP ("<u>Immersive</u>" or the "<u>Debtor</u>"). In my role, I am responsible for, and/or materially engaged with financial management on, among other things, (a) all restructuring activities and initiatives of Immersive, (b) accounting and cash management, (c) the development of, or revisions to, Immersive's wind down plan, and (d) engagement with creditors and other stakeholders. Accordingly, I am familiar with, and have personal knowledge of the transactions, communications and other matters that are the subject of this Declaration (the "<u>Declaration</u>").

2.  I am familiar with the Debtor's operations, business and financial affairs, and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, the Debtor's business records, records of legal and administrative proceedings involving the Debtor, information supplied to me by the Debtor's professionals, and/or the Debtor's professionals and advisors, or my review of relevant documents, emails and other written communications, or my opinion, which is in turn based upon my experience and

1

knowledge of the Debtors' industry, operations, and financial conditions. If called to testify, I could and would testify competently as to the facts set forth herein.

3. I submit this declaration in support of the Debtor's petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), filed on May 30, 2025 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Court"), and assist the Court and parties in interest in understanding the circumstances leading up to this bankruptcy case (the "Chapter 11 Case"). To that end, this declaration provides background information about the Debtor's corporate history, business operations, capital structure and recent challenges, as well as the bankruptcy proceedings of related entities. This Declaration supports the Debtor's petition and this Chapter 11 Case, which was commenced under subchapter V of chapter 11 of the Bankruptcy Code.

## Formation and Ownership Structure

4. The Debtor was organized pursuant to that certain Agreement of Limited Partnership of Immersive Art Space LP, a Delaware limited partnership, dated as of November 13, 2020 (the "Partnership Agreement"), by and among 031165 USA, Inc.[1], a Delaware corporation (" 031165 USA"), Maestro Immersive Art, Inc., a New York corporation ("Maestro") and Immersive Art Space LLC, a Delaware limited liability company ("IAS LLC").

## Background Regarding the Debtor's Historical Operations

5. The Debtor is one of many affiliated entities that are or were in the business of producing immersive art show exhibits in Canada, the United States, and various cities around the world. The Debtor operated solely in Chicago, Illinois. While it was operating, the Debtor produced engaging, immersive exhibits to educate audiences on the works and lives of artists and

---

[1] Successor in interest to Lighthouse Immersive USA, Inc., successor in interest to Lighthouse Immersive USA, Corp.

historical figures such as Frida Kahlo, King Tutankhamun, Wolfgang Mozart, and Claude Monet and the impressionist movement. Every immersive exhibit included educational materials, guides, albums, catalogues and audio tracks to explain the subject matter of the exhibit. The Debtor often invited experts, such as professors and scholars, on the subjects to talk with patrons about the subject matter prior to the viewing as part of the experience. The Debtor also created a companion app that patrons could interact with to learn about and understand the context and history of the paintings and historical artifacts in the exhibit.

6. In 2023, the Debtor's affiliated entities Lighthouse CA and 031165 USA sought bankruptcy protection in Canada (under the CCAA) and the United States, respectively, to formally restructure and right size their businesses. The Debtor's parent company, 031165 USA, commenced chapter 15 proceedings in this Court under the case styled *In re Lighthouse Immersive Inc., et al., Debtors in a Foreign Proceeding*, Case No. 23-11021 (LSS) (the "Chapter 15 Case"). For additional information regarding the Debtor's background, the Debtor hereby incorporates by reference the First Day Declaration filed at Docket No. 2 in the Chapter 15 Case, a true and correct copy of which is attached hereto as **Exhibit A**. As of the date hereof, the Chapter 15 Case remains open.

7. In conjunction with the wind-down of its affiliates, the Debtor also ceased operating in 2023. Today, the Debtor has a limited amount of assets remaining to satisfy claims and multiple creditors (in addition to the two governmental claimants discussed below) whose aggregate claims far exceed the value of the Debtor's assets. The Debtor, therefore, seeks to reconcile and adjudicate the claims against it through the chapter 11 bankruptcy process and pursue a plan of liquidation for the benefit of all creditors.

**The Debtor's Tax Disputes with the City of Chicago and Cook County**

A.      **The City of Chicago's Amusement Tax and the Ensuing ALJ Litigation.**

8.      Pursuant to section 4-156-020(A) of the Chicago Municipal Code (the "MCC"), the City of Chicago ("Chicago") imposes an "amusement tax" on patrons of certain entertainment events, requiring "[o]wners, managers, operators of amusements or places where amusements are conducted, and ticket resellers [to] collect tax from patrons for witnessing or participating in amusements" in the amount of 9.00%[2] of charges paid for all types of taxable amusements. The MCC defines the term "amusement" as follows:

> (1) any exhibition, performance, presentation or show *for entertainment purposes*, including, but not limited to, any theatrical, dramatic, musical or spectacular performance, promotional show, motion picture show, flower, poultry or animal show, animal act, circus, rodeo, athletic contest, sport, game or similar exhibition such as boxing, wrestling, skating, dancing, swimming, racing, or riding on animals or vehicles, baseball, basketball, softball, football, tennis, golf, hockey, track and field games, bowling or billiard or pool games; (2) any entertainment or recreational activity offered for public participation or on a membership or other basis including, but not limited to, carnivals, amusement park rides and games, bowling, billiards and pool games, dancing, tennis, racquetball, swimming, weightlifting, bodybuilding or similar activities; or (3) any paid television programming, whether transmitted by wire, cable, fiber optics, laser, microwave, radio, satellite or similar means. 'Amusement' does not include lawful gambling at a casino, as that term is defined in 230 ILCS 10/4.

MCC § 4-156-010 (emphasis added).

9.      Importantly, Chicago's Department of Finance (the "DOF") has issued a ruling that states: "Activities that are primarily educational are not amusements and are therefore not subject to the tax."[3] Chicago also provides exemptions for "[c]ertain live cultural

---

[2] As of January 1, 2025, the amusement tax rate increased to 10.25%, but the Debtor's liability has been measured under the 9.00% rate only.

[3] *See* Chicago Amusement Tax Ruling #1.

4

HB: 4904-8235-2198.11

performances,"[4] and based on direct guidance from Chicago's Tax Division – Exemption Unit, businesses do not need to file any paperwork to claim the exemption. *See* **Exhibit B**.

10. The Debtor's understanding was that its immersive exhibits depicting and narrating the works of artists and other historical figures either: (1) were educational in nature, much like a museum, which typically has immersive exhibits and video showrooms and incorporates detailed artist explanations, influences, and artistic evolution, helping visitors understand contributions to historical art movements, and therefore non-taxable; or (2) qualified for the live cultural performance tax exemption, since the immersive art show included dynamic components such as real-time digital projections that evolve based on audience interactions. Further, the Debtor's Partnership Agreement lists "live theatrical productions" among its official business purposes:

> 1.04. <u>Business Purpose</u>. The purpose of the Partnership, either directly or indirectly through one or more wholly owned subsidiaries, is to (i) the production and presentation of the Immersive Van Gogh Exhibit under license from LIGHTHOUSE IMMERSIVE INC. to the Partnership, in the city of Chicago, Illinois, USA (the "*Project*") and such other further productions or presentations of immersive exhibits, ==live theatrical productions== and other experiences as they may otherwise determine, (ii) borrow money in furtherance of the purpose of the Partnership and, in connection therewith, to execute and deliver evidences of indebtedness, and (iii) exercise all powers enumerated in the Act and perform all acts

Partnership Agreement § 1.04. Accordingly, the Debtor reasonably believed that its business was not subject to the amusement tax because either the immersive exhibits were educational or the Debtor qualified for the live cultural performance tax exemption.

11. The Debtor made multiple efforts to confirm that its business was non-taxable or exempt under the amusement tax, contacting both the Chicago Department of Revenue (the "Chicago DOR") and the Chicago DOF.

---

[4] Chicago Dept. of Finance, Amusement Tax (7510) Guidelines, available at https://www.chicago.gov/city/en/depts/fin/supp_info/revenue/tax_list/amusement_tax.html (last accessed May 24, 2025).

12. Prior to November 10, 2020, Maria Shclover, one of the Debtor's members, requested a meeting with Zhenesse Heinemann, the Program Director of Visitor Experience at the Chicago Department of Cultural Affairs and Special Events (the "DCA"), to discuss obtaining a public place of amusement ("PPA") license. Upon information and belief, at that meeting, the parties discussed the amusement tax, and the Debtor was directed to the Chicago DOR for more specific guidance.

13. Upon information and belief, on November 10, 2020, following instructions from the DCA, Ms. Shclover contacted the Chicago DOR to request clarification on whether the Debtor was subject to the amusement tax. In her email to the Chicago DOR, Ms. Shclover highlighted language regarding the live cultural performance from an online FAQ regarding the amusement tax:

> "The capacity of my venue is not more than 1,500 persons. Are my events exempt from the tax? The Amusement Tax shall not apply to admission fees to witness in person live cultural performances that take place in any auditorium, theater or other space in the city whose maximum capacity, including all balconies and other sections, is not more than 1,500 persons. Note: this exemption applies only to venues where admission fees are paid to witness live cultural performances.

14. As Ms. Shclover stated in her email to the Chicago DOR, the Debtor's immersive exhibit would have a 40% occupancy of 160 patrons during Covid-19 and a maximum occupancy of 460 patrons outside of Covid-19, plus an additional 40 non-patrons (staff, security, cleaners, producers), for a maximum possible occupancy of 500 people total. Ms. Shclover sent a link to the Debtor's website and a video trailer of the exhibit and requested clarification on whether the Debtor's business would be exempt from the amusement tax. A true and correct copy of Ms. Shclover's correspondence with the Chicago DOR is attached hereto as **Exhibit C**.

6

15. On November 12, 2020, Irma Meza, a representative of the Chicago Department of Finance's Tax Division – Exemption Unit, responded to Ms. Shclover with the following additional guidance:

> ---------- Forwarded message ---------
> From: **City of Chicago Tax Exemptions** <taxexemptions@cityofchicago.org>
> Date: Thu, Nov 12, 2020 at 4:56 PM
> Subject: Re: Amusement taxes for new Museum of Immersive Art "Lighthouse ArtSpace Chicago" {920833}
> To: <manager@maestroartist.com>
>
>
> Good afternoon,
>
> Per the statement below, if you host a live cultural event in a venue with a capacity of less than 1,500, then this event would not be subject to the amusement tax. There is no paperwork needed to claim this exemption.
>
> Per Section 4-156-020(D)(1) of the Chicago Municipal Code, the Amusement Tax shall not apply to admission fees to witness in person live cultural performances that take place in any auditorium, theater or other space in the city whose maximum capacity, including all balconies and other sections, is not more than 1500 persons.
>
> https://www.chicago.gov/city/en/depts/fin/supp_info/revenue/tax_list/amusement_tax.html
>
> Thank you.
>
> Irma Meza
> Chicago Department of Finance
> Tax Division - Exemption Unit

16. Relying on this guidance from the DOF, the Debtor did not collect a 9% amusement tax from its patrons during the period of time in which it was operating. The Debtor believed its immersive exhibit was exempt from the amusement tax because the exhibit was both educational in nature and qualified as a live cultural performance with a capacity of much less than 1,500 patrons.

17. Two years later, on November 23, 2022, the DOF commenced a tax audit of the Debtor regarding the amusement tax. Ms. Shclover responded to the DOF's audit letter on behalf of the Debtor and provided the requested documentation, including the aforementioned

correspondence with the DOF's representative regarding the live cultural exemption. During the investigation, the parties attempted to reach a good faith settlement but were unable to do so. The investigation led the DOF to conclude that the Debtor was liable for the amusement tax beginning on February 1, 2021, and continuing through June 30, 2023.

18. On August 7, 2023, the DOF assessed amusement tax liability of **$5,371,217.64** against the Debtor (the "City's Assessment"), which includes 12% interest, among other charges:

Tax Type: 7510, Code Chapter: 4-156

| | |
|---|---|
| Tax Due | : $ 3,571,884.00 |
| Interest Due* | : $ 727,768.44 |
| Late Penalty Due | : $ 178,594.20 |
| Failure to File Penalty Due | : $ 892,971.00 |
| **Total Due** | : **$ 5,371,217.64** |

* Currently interest is at the rate of 12% per annum simple interest, calculated daily, based on a 365-day calendar year.

Pay This Amount To:

Chicago Department of Finance
Tax Enforcement Unit
DePaul Center, Suite 300
333 S. State Street
Chicago, IL 60604-3977

A true and correct copy of the Notice of Tax Determination and Assessment is attached hereto as **Exhibit D**.

19. On September 11, 2023, the Debtor, through its tax counsel at Duane Morris, filed a Protest and Petition for Hearing to contest the City's Assessment. A true and correct copy of the Protest and Petition is attached hereto as **Exhibit E**. Upon information and belief, the Debtor's tax protest triggered two administrative proceedings at the Department of Administrative Hearings ("DOAH") before an administrative law judge ("ALJ") under Case Nos. 23 TX 0517 and 23 TX 0516 (the "City ALJ Proceedings"). However, the Debtor and its counsel are unable to obtain additional information about the City ALJ Proceedings online because Chicago does not offer access to a docket or other online database for defendants to

obtain information regarding their case, such as hearing dates and other important deadlines. Further, in order to obtain a pleading or order, counsel must enter a formal appearance and appear in person at the ALJ to review a copy of the document or else file a Freedom of Information Act ("FOIA") Request. *See* Rule 12.1, CITY OF CHI. DEP'T OF ADMIN. HEARINGS, RULES & REGULATIONS (July 14, 2022) (hereinafter, the "DOAH Rules"). FOIA requests can take weeks to process. Accordingly, the Debtor has found defending itself in the City ALJ Proceedings to be unreasonably difficult from a practical standpoint. The opacity and sheer difficulty of the City ALJ Proceedings exemplify the unfairness that the DOAH presents to the Debtor as a litigation forum to resolve its purported tax liability.

20. Since the audit was initiated and throughout the City ALJ Proceeding, the Debtor retained counsel to represent the Debtor and attempt to settle with the City. For example, upon information and belief, in early 2024, counsel for the Debtor contacted Jason Rubin, Assistant Corporation Counsel in the Chicago Department of Law, to engage in good faith settlement discussions. However, to date, the Debtor and the City have been unable to reach an agreement. Notwithstanding the guidance that the Debtor received regarding the live cultural performance exemption, the City has been generally unwilling to compromise on grounds that: (i) emails from the DOF do not constitute "written information" or "written advice" under MCC § 3-4-325, and (ii) the DOF never provided confirmation that the Debtor's immersive exhibit qualified as a live cultural performance entitled to the amusement tax exemption. A true and correct copy of a letter dated April 25, 2024, from Mr. Rubin on behalf of the City, outlining the City's position, is attached hereto as **Exhibit F**.

**B.     Cook County's Amusement Tax Assessment, the Ensuing ALJ Litigation, and the Default Judgment.**

21.     Cook County, Illinois ("Cook County") imposes an amusement tax similar to Chicago's amusement tax. The Cook County Code of Ordinances (the "CCCO") defines an amusement as follows:

> *Amusement* means any exhibition, performance, presentation or show for entertainment purposes, including, but not limited to, any theatrical, dramatic, musical or spectacular performance, promotional show, motion picture show, flower, poultry or animal show, animal act, circus, rodeo, athletic contest, sport, game or similar exhibition, such as boxing, wrestling, skating, dancing, swimming, riding on animals or vehicles, baseball, basketball, softball, soccer, football, tennis, golf, hockey, track and field games, bowling, or billiard and pool games. For purposes of this article, the term 'amusement' shall not mean any recreational activity offered for public participation or on a membership or other basis, including, but not limited to, carnivals, amusement park rides and games, bowling, billiards and pool games, dancing, tennis, golf, racquetball, swimming, weightlifting, bodybuilding or similar activities. For purposes of this article, the term 'amusement' shall not mean raffles, as defined in 230 ILCS 15/1 (Raffles Act-definitions), intertrack wagering facilities, as defined in the Illinois Horse Racing Act of 1975 (230 ILCS 5/1 et seq.), or automatic amusement devices.

CCCO § 74-391.

22.     Cook County also provides an exemption for live cultural performances with a capacity of fewer than 750 persons. *Id.* § 74-392(d)(1). Under the CCCO, "live theatrical, live musical or other live cultural performance" is defined as a "live performance in any of the disciplines which are commonly regarded as part of the arts, such as live theater, music, opera, drama, comedy, ballet, modern or traditional dance, and book or poetry readings." *Id.* § 74-391.

23.     Following the City's Assessment, on September 14, 2023, the Department of Revenue of Cook County (the "Cook County DOR") issued a separate Notice of Tax Determination and Assessment, thereby assessing additional amusement tax liability of **$1,815,358.06** against the Debtor (the "County's Assessment") for the period February 1, 2021,

through March 31, 2023. The County's Assessment includes 12% interest, a 10% late payment penalty, and a 25% "negligence or willfulness" penalty, as follows:

```
ASSESSMENT FOR THE PERIOD OF 02/01/2021 THROUGH 03/31/2023

TAX AMOUNT DUE (AMUSEMENT TAX / NON-EXEMPT)          $ 1,147,661.01
INTEREST DUE (AS OF 09/30/2023 )                     $   266,015.64
LATE PAYMENT PENALTY DUE OF 10%                      $   114,766.10
NEGLIGENCE OR WILLFULNESS PENALTY @25%               $   286,915.31

TOTAL DUE                                            $ 1,815,358.06

*INTEREST IS CALCULATED PER MONTH OR FRACTION THEREOF,
UNTIL PAID OR REDUCED TO JUDGMENT, AT THE RATE OF 1.25%
THRU 12/31/14 AND 1% FROM 01/01/2015 THROUGH 09/30/2023
```

PLEASE REMIT THIS AMOUNT TO:

COOK COUNTY DEPARTMENT OF REVENUE
TAX COMPLIANCE DIVISION
ATTN: THOMAS NJO
118 N. CLARK STREET, ROOM 1160
CHICAGO IL 60602

A true and correct copy of Cook County's Audit Report dated September 14, 2023 (the "CC Audit Report"), which contains the Cook County DOR's Notice of Tax Determination and Assessment, is attached hereto as **Exhibit G**. Cook County's Amusement Tax was assessed at 3.00% of sales during the taxation period. CC Audit Report at 11.

24. On October 4, 2023, tax counsel for the Debtor filed a Protest and Petition for Hearing with the Cook County DOR in response to the Notice of Tax Determination and Assessment dated September 14, 2023. A true and correct copy of the Protest and Petition is attached hereto as **Exhibit H**. The Debtor's tax protest triggered a second ALJ proceeding at the DOAH before ALJ Denis Guest. The proceeding is styled *County of Cook, an Illinois County, Petitioner, v. Immersive Art Space LP, 108 W Germiania Place, Chicago, IL 60610, Respondent*, Citation No. RA23013 (the "County ALJ Proceeding").

25. When the Debtor began the process of engaging bankruptcy counsel to explore its options in late April, there was a trial set on or around June 12, 2025, and a briefing deadline on May 12, 2025. Throughout the majority of the County ALJ Proceeding, the Debtor was represented by the law firm Nixon Peabody. The Debtor ultimately decided to pursue bankruptcy as an alternative to litigating in the County ALJ Proceeding, so Nixon Peabody filed a motion to withdraw as counsel to the Debtor and a motion to continue the trial to allow the Debtor to retain substitute counsel.

26. On May 12, 2025, ALJ Guest entered an order granting Nixon Peabody's motion to withdraw but denying the request for a continuance of the trial. A true and correct copy of ALJ Guest's May 12 order is attached hereto as **Exhibit I**.

27. Also on May 12, 2025, before the briefing deadline had passed, ALJ Guest unexpectedly entered a default judgment against the Debtor in the amount of $2,056,366.87 (the "Default Judgment"), notwithstanding that the Debtor had not missed any prior deadlines, the trial was still a month away, and Debtor was not given an opportunity to retain new counsel since Nixon Peabody's motion to withdraw was granted the same day. A true and correct copy of ALJ Guest's Findings, Decisions & Order rendering the Default Judgment against the Debtor is attached hereto as **Exhibit J**. As a result of the Default Judgment, the Debtor was deprived of its opportunity to defend itself on the merits in the County ALJ Proceeding for no discernible reason other than that its tax counsel, Nixon Peabody, had withdrawn.

28. Just prior to the filing of this Chapter 11 Case, the Debtor filed a motion to set aside the Default Judgment and a suggestion of bankruptcy in the County ALJ Proceeding, true and correct copies of which are attached hereto as **Exhibit K**. As of the date hereof, ALJ Guest has not adjudicated the Debtor's motion to set aside the Default Judgment.

## The Goal of the Debtor's Chapter 11 Case

29. The Debtor now seeks bankruptcy relief in this Court specifically because it is familiar with the Debtor's operations and organizational structure as a result of the Chapter 15 Case. The Debtor's goal is to utilize the U.S. bankruptcy laws to centralize its tax litigation with the City and Cook County in one forum while pursuing a plan of liquidation to repay creditors. The Debtor has found no justice in the DOAH proceedings before the ALJs, which, for example, resulted in the inexplicable Default Judgment against the Debtor in the amount of $2,056,366.87. The lack of transparency of the ALJ proceedings has made the Debtor's efforts to represent itself extremely difficult. There is also potentially a material conflict of interest given that the ALJs' compensation is undisclosed, yet they are responsible for adjudicating multi-million-dollar claims on behalf of the government entities that hired them.

30. Contemporaneously with or shortly after the filing of this Chapter 11 Case, the Debtor intends to use the procedural mechanisms available to it under applicable law to adjudicate the ALJ claims in this Court, where the Debtor is far more likely to receive a just and fair adjudication of its purported tax liability.

*[Signature page follows.]*

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on May 30, 2025.  By:  *Michael Willetts*
Signed by: 1FC5E1B9BB294FE...
Michael Willetts
Consultant and Authorized Agent
Immersive Art Space LP

HB: 4904-8235-2198.11